IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MONTEZ ARTIS (B-84281), ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> WEXFORD HEALTH SOURCE, ) <br> INC., et al., ) <br> ) <br> Defendants. ) | Case No. 19 C 5959 <br><br> Hon. Matthew F. Kennelly |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Montez Artis, who is imprisoned in the Illinois Department of Corrections, filed a *pro se* lawsuit under 42 U.S.C. § 1983 after experiencing hearing loss in his right ear as well as pain that he alleges resulted from inadequate medical care at Stateville Correctional Center. The previously assigned judge allowed Mr. Artis's suit to proceed against Wexford Health Sources, Inc., which provides healthcare to persons imprisoned in the IDOC; Dr. Hector Garcia, Wexford's national medical director at the relevant time; and the estate of Dr. Saleh Obaisi, who was Stateville's medical director when Mr. Artis sought treatment for his ear. For the reasons discussed below, the Court grants the defendants' motion for summary judgment.

There are two preliminary issues. First, defendants support their contentions in part by an affidavit prepared by Dr. Garcia. *See* Dkt. 86. In the affidavit, Dr. Garcia takes on the dual role of deciphering Mr. Artis's medical records and expressing opinions on causation and the standard of care. There is no indication, however, that

defendants ever disclosed Dr. Garcia as an expert as required by Federal Rule of Civil Procedure 26(a)(2). See Dkt. 36 (mentioning treating physicians); Dkt. 63 (mentioning fact discovery); Dkt. 92, pg. 161 ("Dr. Garcia is appearing in his personal capacity as a named defendant in this matter . . . . Garcia's answers to these deposition questions/interrogatories are each in his personal capacity."). The Court therefore will consider the statements in Dr. Garcia's affidavit only to the extent they concern his own treatment decisions or reflect what is recorded in the medical records. See Musser v. Gentiva Health Serv., 356 F.3d 751, 757-58 (7th Cir. 2004) ("even treating physicians and treating nurses must be designated as experts if they are to provide expert testimony").

Second, the defendants argue at various points that Mr. Artis's contentions are not properly supported. In particular, they appear to ask the Court to effectively disregard Mr. Artis's versions of his dealings with medical personnel because they are not supported or corroborated by documentation. The Rules of Evidence, however, impose no such corroboration requirement. Mr. Artis's deposition testimony, to the extent it is admissible, is appropriately considered. In particular, his deposition testimony regarding his interactions with Dr. Obaisi is admissible in that it involves statements made for the purpose of obtaining medical care, see Fed. R. Evid. 803(4), and statements by an opposing party, see Fed. R. Evid. 801(d)(2)(A). And Mr. Artis's testimony regarding what he told other medical personnel at Stateville is likewise properly admissible. See Fed. R. Evid. 803(4).

## Background

This lawsuit concerns the care Mr. Artis received at Stateville for complaints of

pain and ringing in his right ear that, he says, culminated in hearing loss in that ear. Mr. Artis traces the problems with his right ear to an incident in January 2017 when, he says, a cockroach crawled into his ear while he was asleep. The next day, he testified, a nurse flushed the dead insect from his ear.

Mr. Artis says that he next attempted to bring his ear pain to the attention of medical personnel at an appointment for a different matter on January 30, 2017. Pl.'s Stat. of Mat'l Facts (PSOF) ¶ 9. He was told, however, that medical staff could only address one complaint at a time, so he would have to submit another sick call request for his ear pain.

Mr. Artis was next seen by Stateville medical staff for complaints of ear pain on April 15, 2017. He complained of intermittent sharp pain in his right ear but did not report any hearing loss. A note in his medical records reflects that the inside of his ear was red. He was referred to see a physician's assistant.

Mr. Artis saw the physician's assistant in mid-April 2017. Though not reflected in his medical records, Mr. Artis says he complained of sharp pain and ringing in his right ear. He testified that the PA examined his ear and reported that it was red on the inside, and "she gave me medication for it." Artis Dep. at 75-76. Mr. Artis's medical records reflect that he was given pain medication. He further testified that the PA put in for him to see Stateville's medical director—Dr. Obaisi—but that he did not get an appointment with Dr. Obaisi until late September 2017. Id. at 76.

Mr. Artis testified during his deposition that from April through September 2017, he had "ringing [and] sharp pain here and there" regarding his ear. Id. at 77. Mr. Artis testified that he did not remember whether he received any treatment for his ear during

3

this period, *see* Artis Dep. at 77-78, and his medical records do not reflect any complaints to medical staff about ear pain during this period. In fact, Mr. Artis's medical records reflect that, when he was seen by medical personnel on April 27, 2017, he complained only of cold symptoms. Defs.' Stat. of Mat'l Facts (DSOF) ¶ 11. Similarly, on May 1, 2021, he complained of a cough and sore throat, but his records do not indicate that he complained about his ear. DSOF ¶ 12. The records reflect that Mr. Artis declined medical care on May 12 and 13, 2017; he says that neither of these appointments was "regarding his hearing issues." Pl.'s Resp. to DSOF ¶ 12.

Mr. Artis's medical records reflect that he next complained to medical staff about his ear on July 16, 2017, when he reported that the ear had been ringing and bothering him for two days. DSOF ¶ 13. His records do not indicate that he reported pain, drainage, or hearing loss, *id.*, but Mr. Artis says he complained of pain in the ear. PSOF ¶ 13. His medical records reflect that an examination of the ear on that date revealed no swelling, drainage, redness, or discoloration of his tympanic membrane. DSOF ¶ 13. Three days later, Mr. Artis again complained about intermittent ringing but also reported that a similar episode had resolved within one day. DSOF ¶ 14. Records reflect that the PA determined that Artis had allergic rhinitis, continued his medications, and advised him to return to the clinic as needed. *Id.* On July 25, 2017, Mr. Artis turned down a medical appointment so that he could go to the prison yard. *Id.*

Mr. Artis saw Dr. Obaisi for the first and only time on September 27, 2017. DSOF ¶¶ 15, 16. According to his medical records, on that date he complained of periodic throbbing frontal headaches and requested medications for a head cold and headaches. DSOF ¶ 15. The records reflect that Dr. Obaisi assessed Mr. Artis as

having rhinitis and headaches.  *Id.*  He prescribed cold and headache medicine and instructed Mr. Artis to follow-up as needed.  *Id.*  Mr. Artis testified during his deposition, however, that during the September 27, 2017 visit, he handed Dr. Obaisi an affidavit that referenced several health issues, including his right ear; it stated, "I need my right ear checked somethings wrong."  *See* Pl.'s Resp. to DSOF ¶ 16; Pl.'s Ex. D1, Dkt. 92 at 46.  Mr. Artis also says that he told Dr. Obaisi about intermittent pain and ringing in his right ear.  Pl.'s Resp. to DSOF ¶ 18; *see* PSOF ¶ 15.  But, he says, Dr. Obaisi did not address his complaints about his right ear.  DSOF ¶ 32.  He testified that Dr. Obaisi "told me none of that is going to happen" and that he would not refer Mr. Artis to an ear, nose, and throat (ENT) specialist.  Artis Dep. at 81; PSOF ¶ 15.  He also testified that Dr. Obaisi "never examined my ear.  He never gave me medication.  He never referred me in to have a hearing test, which is what I asked for[.]  [A]ny ENT, ear specialist.  He denied all of that."  Artis Dep. at 81.  This was the only occasion on which Mr. Artis saw Dr. Obaisi, who died in December 2017.  *See* Artis Dep. at 82.

An examination of Mr. Artis's right ear more than six months later, on April 3, 2018—by medical staff in response to his complaints of cold symptoms—revealed an accumulation of earwax but no redness.  DSOF ¶ 17.

Records reflect that Mr. Artis next complained to medical staff about his right ear on June 6, 2018, when he told a mental health professional that he had ringing in the ear.  DSOF ¶ 18.  His medical records reflect that he reported some hearing loss at that time but no pain or drainage.  *Id.*  Mr. Artis says, however, that he did complain about pain in the ear.  PSOF ¶ 18.  An appointment was made for him to see the PA on June 20, 2018, but according to records he did not appear for his appointment.

5

DSOF ¶ 18. When he saw the PA about one month later, on July 24, 2018, he complained of pain in his right ear. DSOF ¶ 19. He also reported diminished hearing in that ear and that loud noises caused his ear to ring. Id. On August 12, 2018, records reflect, Mr. Artis complained about "earache/earwax impaction" in his right ear along with hearing loss and a past history of earaches, but he reported no drainage. DSOF ¶ 20. An examination revealed redness in the right ear, but Mr. Artis "passed" a finger-rub test, which is a non-instrumental test for detecting hearing loss. Id. Mr. Artis was referred to Stateville medical director Dr. Okezie. DSOF ¶ 19.

Mr. Artis saw Dr. Okezie for the first time on August 22, 2018 for complaints of hearing loss and intermittent pain in his right ear. DSOF ¶ 22. Dr. Okezie noted in Mr. Artis's medical records that his tympanic membranes were normal, and he recommended an on-site audioscope—in other words, a hearing test (Stateville had an audioscope on site). Id. Dr. Okezie presented Mr. Artis's case to Dr. Garcia, Wexford's medical director, on August 28, 2018, during collegial review. DSOF ¶ 23. Collegial review is a process by which Wexford's on-site medical providers consult with their colleagues to review patient care and determine a treatment plan. Id. Collegial review also serves as a preauthorization process to ensure patients are being referred for appropriate care. Id. Dr. Garcia did not examine Mr. Artis in person. DSOF ¶¶ 5, 33. Mr. Artis's medical records reflect that Dr. Okezie's recommendation for an on-site audioscope was denied during collegial review. See DSOF ¶ 23; DOSF Ex. B at Wexford 000294. Dr. Garcia says, however, that because an audioscope was available on site at Stateville, there was actually no need for collegial review, so the notation in Mr. Artis's medical records should have been that collegial review approval

6

was not necessary. DSOF ¶ 23.

A form dated August 29, 2018 and signed by Dr. Garcia also reflects that a hearing screening was "not authorized at this time based on the following: OTHER TREATMENT PLAN." See Pl.'s Resp. to DSOF ¶ 24. Dr. Garcia says now that the "other treatment plan" was an on-site audioscope, but that doesn't make much sense—that's the very treatment that Dr. Okezie had requested and that Wexford had denied in collegial review. DSOF ¶ 24. Indeed, the form does not specify that an on-site audioscope was the alternate treatment; it reflects only that "ATP made to treat onsite." See Pl.'s Resp. to DSOF ¶ 24; DSOF Ex. B at Wexford 000322. (The Court assumes that "ATP" stands for alternative treatment plan or something similar.)

One way or another, however, Mr. Artis *was* examined via the on-site audioscope at Stateville. The exact date is not reflected in the medical records, but notations suggest that it was between August 29, 2018 and April 4, 2019. See DSOF ¶ 25. Mr. Artis recalls the date as March 22, 2019. PSOF ¶ 24. According to Mr. Artis's record, the test revealed "some" hearing loss in his right ear. DSOF ¶ 26. He was referred for an off-site audiology consult, which Dr. Garcia approved on April 30, 2019. *Id.*

Hearing aid specialist Dr. Matt Wahl saw Mr. Artis on July 29, 2019. DSOF ¶ 28. His records do not reflect that Mr. Artis complained about ear pain. DSOF ¶ 31. Dr. Wahl recommended hearing aids, DSOF ¶ 28, which Dr. Garcia approved, DSOF ¶ 29. Mr. Artis received them on August 23, 2019. DSOF ¶ 30.

Mr. Artis testified during his deposition that, throughout 2017 and 2018, he regularly participated in daily activities, such as going to the yard, exercising, doing legal work, conversing with others, attending religious activities, and engaging in personal

7

hygiene. DSOF ¶ 34. He explained in response to the defendants' summary judgment submissions, however, that the pain and ringing in his ear was intermittent. PSOF ¶ 34. When he was experiencing ear pain, he says, he could not perform "any normal function, exercise, legal work, conversations, etc." *Id.*

Mr. Artis filed this lawsuit shortly after he received his hearing aids. In his first amended complaint, Mr. Artis challenged the care he received for his complaints of ear pain and contended that, had his complaints been addressed sooner, he might not have lost hearing in his right ear. *See* Dkt. 12. He also devoted a substantial portion of his complaint to allegations that the medical providers' treatment decisions were driven by Wexford's purported policies. *Id.*

## Discussion

The defendants argue that they are entitled to summary judgment for three reasons: (1) Mr. Artis did not suffer from an objectively serious medical condition; (2) he cannot establish the level of culpability necessary to hold Drs. Obaisi and Garcia liable for deliberate indifference; and (3) Mr. Artis cannot show that a Wexford policy or widespread practice caused a constitutional violation. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After the moving party has identified grounds for its motion, the opposing party must present "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). If the opposing party "fails to establish the existence of an element essential to his case, one on which he would bear the

8

burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (internal quotations marks omitted). To prevail on his claim in this case, Mr. Artis must establish that he suffered from an objectively serious medical condition and that the defendant knew about and was deliberately indifferent to the condition. *See id.* The Court assumes for purposes of discussion that Mr. Artis's medical need as he says he presented it to medical personnel at Stateville—pain and ringing in his right ear, together (at some later point) with some degree of hearing loss—constituted an objectively serious medical condition and proceeds ahead to the question of deliberate indifference.

The deliberate indifference inquiry looks to the defendant's state of mind. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). To be found deliberately indifferent, a healthcare provider "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Lockett*, 937 F.3d at 1023 (quoting *Farmer*, 511 U.S. at 837). A defendant's "failure to alleviate a significant risk that he should have perceived but did not" is not deliberate indifference. *Farmer*, 511 U.S. at 838. Similarly, "negligence or even medical malpractice" is not deliberate indifference. *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

To defeat a motion for summary judgment, a plaintiff "must provide evidence"

that each defendant "*actually* knew of and disregarded a substantial risk of harm." *Lockett*, 937 F.3d at 1023 (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)). Evidence sufficient to create a triable issue includes "proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment," the "obviousness of the risk from a particular course of medical treatment," or the "defendant's persistence in a course of treatment known to be ineffective." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016) (citation omitted). "Collective failures of care are not enough; to prevail against any defendant at trial," a plaintiff must provide evidence that each "individual defendant acted with the requisite deliberate indifference." *Soto v. White*, No. 19-3135, 2022 WL 2115299, at *3 (7th Cir. June 13, 2022).

1. **Dr. Obaisi**

Mr. Artis attempts to establish liability against Dr. Obaisi in three ways. First, he contends that Dr. Obaisi's conduct at the September 27, 2017 appointment reflects deliberate indifference. *See* Pl.'s Resp. to MSJ at 12-14. According to Mr. Artis, he complained about "numerous . . . medical issues" including ear pain and ringing during the appointment, gave Dr. Obaisi an affidavit documenting his complaints, and asked for an MRI (regarding another condition), CT scan and referral to an ENT specialist. *See* Pl.'s Resp. at 12. He says that Dr. Obaisi reviewed his records but did not examine his ear and denied his requests for specialty care, saying—with regard to a separate, unrelated condition—that an MRI for that condition "cost[s] too much." *Id.* at 12.

Mr. Artis asserts that the issues he reported to Dr. Obaisi were legitimate, as

evidenced by an MRI taken a year and a half later that revealed a "sever[e] spine injury" and what he characterizes as Dr. Wahl's finding that his right ear was "dead." *Id.* at 13. Mr. Artis has not, however, presented medical evidence tending to show that his complaints of ear pain on September 27, 2017—coupled with the four entries about ear problems in his medical records and a history of allergies and cold symptoms—ought to have alerted Dr. Obaisi to a serious problem brewing in his ear or should have indicated any particular course of treatment. Similarly, Mr. Artis has offered no competent evidence tending to show that Dr. Obaisi's failure to examine or treat his ear on September 27, 2017, was based on an absence of medical judgment given the information he had at the time. Rather, all that Mr. Artis has offered on these points is his own views, which lack any evidentiary foundation. "Without any medical evidence of inadequate treatment, a prisoner's self-serving opinion of the quality of treatment is insufficient to raise a genuine issue of material fact." *Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002).

The fact that Dr. Obaisi denied Mr. Artis's request for specialty care does not change the analysis. "A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). The failure to refer an imprisoned person for outside treatment constitutes deliberate indifference only if it was "blatantly inappropriate." *Id.* This is so even though testing performed by Dr. Wahl nearly two years later revealed hearing loss in Mr. Artis's right ear, as there is no evidence that would permit a reasonable jury to find that need for consultation with an ENT physician was apparent in September 2017.

Dr. Obaisi's purported refusal to approve diagnostic testing for unrelated conditions is immaterial because it has no bearing on whether he improperly denied Mr. Artis's request to see an ENT doctor. Likewise, Dr. Obaisi's denial of an MRI—an expensive diagnostic test—for an unrelated condition because of cost does is not evidence that he denied Mr. Artis's request to see an ENT for cost-based reasons.

Mr. Artis also contends that Dr. Obaisi has a "history of denying patients adequate, reasonable and timely medical care" by analogizing his care to the care received by the prisoner in *Zavala v. Obaisi*, No. 17 C 3042, 2021 WL 1172774 (N.D. Ill. Mar. 29, 2021). Pl.'s Resp. to MSJ at 16-19. The short answer to this is that Dr. Obaisi's actions or inactions in Mr. Zavala's situation are inadmissible to show that he acted similarly in Mr. Artis's case. See Fed. R. Evid. 404(b).

In addition, this is not a case in which a physician declined to treat an imprisoned person over an extended period or doggedly persisted with ineffective treatment. Rather, Dr. Obaisi saw Mr. Artis just once for complaints of ear pain and ringing, assessed his condition as rhinitis, and prescribed cold and headache medications. Even if one accepts that Dr. Obaisi did not examine the ear and did not refer Mr. Artis to an ENT specialist, Mr. Artis has not presented evidence from which a reasonable jury could infer that, under the circumstances, Dr. Obaisi's actions and inaction "represent[ed] so significant a departure from accepted professional standards or practices that it calls into question whether [he] actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (citation omitted).

For these reasons, Dr. Obaisi's estate is entitled to summary judgment in its favor.

2. Dr. Garcia

Mr. Artis argues that Dr. Garcia denied him reasonable, timely, and adequate medical care following Dr. Okezie's request for an audioscope test. Due to the denial of Dr. Okezie's recommendation, Artis's receipt of an on-site audioscope was delayed by about six months. Thus, to survive Dr. Garcia's motion for summary judgment, Mr. Artis must present evidence that would permit a reasonable jury to find that the six-month delay exacerbated his injury or unnecessarily prolonged his pain. *See Petties*, 836 F.3d at 730-31.

Mr. Artis contends that an audioscope "can be used to prevent hearing loss." Pl.'s Resp. to MSJ at 22; *see* PSOF ¶ 42 (asserting that "pain, ringing, and hearing loss could have been prevented" if he had "received an on-site audioscope"), but he offers no supporting evidence Mr. Artis's unsupported statement isn't even admissible, as he lacks the background needed to render an opinion on this point, and that aside, his bare statement on this point would not permit a reasonable jury to find in his favor. Mr. Artis also says that Dr. Okezie told him that "there was nothing else he could do" after Garcia denied the on-site audioscope, but Mr. Artis offers no evidence that there was any other treatment available at that point that would have helped him.

"[S]urviving summary judgment requires evidence, not speculation." *Wilson v. Dittman*, 732 F. App'x 475, 476 (7th Cir. 2018). Though Mr. Artis experienced hearing loss that requires the use of hearing aids, the proposition that his condition may have deteriorated to some extent during the six months between the date Dr. Garcia denied the recommended audioscope and the date Mr. Artis got the test is not evidence that would permit a reasonable jury to find that the denial caused any part of his hearing

13

loss. It is simply too speculative. *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988) ("Correlation is not causation."). For these reasons, Dr. Garcia is entitled to summary judgment.

3. **Wexford**

The gist of Mr. Artis's claim against Wexford is that if Wexford's staff had treated his complaints of ear pain and ringing, he would not have experienced hearing loss. He points to his two-year history of complaints about his ear and says he was "given medication once, denied diagnosis twice, specialty care (2) twice, pain medication about 10 to 12 times when requested." Pl.'s Resp. to Defs.' MSJ at 27. He also points to several grievances in which he complained that Wexford's "medical staff" were "denying him treatment." *See, e.g., id.* at 27-28.

To prevail against Wexford, Mr. Artis must show more than poor medical judgment or even malfeasance by Wexford's employees. *See, e.g., Barrow v. Wexford Health Sources, Inc.*, 793 F. App'x 420, 424 (7th Cir. 2019) (declining to reconsider availability of *respondeat superior* liability against Wexford under 42 U.S.C. § 1983). Rather, Mr. Artis must provide evidence from which a reasonable jury could find that Wexford had a custom or policy that caused him a constitutional injury. *See, e.g., Crittenden v. Ippel*, No. 20-3479, 2022 WL 42866, at *2 (7th Cir. Jan. 5, 2022).

The problem here—as indicated in the earlier sections of this ruling—is that Mr. Artis has provided no admissible evidence that there was any different course of care or earlier treatment that could have prevented his hearing loss or addressed his complaints of pain better than they were handled. For this reason alone, a claim against Wexford that its policies caused him a constitutional injury. *See Walker*, 30 F.

App'x at 628 (requiring "medical evidence of inadequate treatment" to survive summary judgment). Wexford is entitled to summary judgment on this basis, and thus the Court need not consider its remaining contentions.

## Conclusion

It is truly unfortunate that Mr. Artis lost hearing in his right ear while imprisoned. But he has not provided admissible evidence from which a reasonable jury could find that there was another appropriate course of treatment that would have avoided this or reduced his reported ear pain during the period at issue. Mr. Artis's unsupported belief that a different type of care might have averted his loss is not enough to defeat summary judgment. *See Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of care" is not enough to establish an Eighth Amendment violation). For the reasons described above, the Court grants the defendants' motion for summary judgment [dkt. no. 80] and directs the Clerk to enter judgment in favor of the defendants and against the plaintiff.

Date: January 6, 2023

_____
MATTHEW F. KENNELLY
United States District Judge